FILED
JAMES J. VILT JR., CLERK
U.S. DISTRICT COURT
W/D OF KENTUCKY

Date: Aug 13, 2026



UNITED STATES DISTRICT COURT
for the
WESTERN DISTRICT OF KENTUCKY

UNITED STATES OF AMERICA )
v. )
) Case No. 3:26-mj-742
Yu Jie YIN )
*Defendant*

**CRIMINAL COMPLAINT**

I, the complainant in this case, state the following is true to the best of my knowledge and belief.

On or about the date(s) of _February 3, 2026, continuing through at least on or about March 22, 2026__ in the county of Jefferson in the Western District of Kentucky, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1956(h) | Money Laundering Conspiracy |
| 18 U.S.C. § 1349 | Wire Fraud Conspiracy |

This criminal complaint is based on these facts:
See attached affidavit.

x❑ Continued on the attached sheet

Aaron Kissinger
*Complainant's signature*

S/A Aaron Kissinger, IRS-CI
*Printed name and title*

*Subscribed and sworn to by telephone in accordance with Fed. R. Cr. P. Rule 4.1.*

Date: August 13, 2026

*Judge's Signature*

City and State: Louisville, Kentucky

Regina S. Edwards, U.S. Magistrate Judge
*Printed Name and Title*

*EGM **(AUSA initials)***

**Affidavit in support of Criminal Complaint for Yu Jie YIN**

Your affiant, Special Agent Aaron Kissinger, Internal Revenue Service – Criminal Investigation ("IRS-CI"), being duly sworn, deposes and says:

1. This affidavit is based upon my personal knowledge and upon information reported to me by federal and local law enforcement officers and others with knowledge of the case. Unless specifically indicated otherwise, all conversations and statements described in the affidavit are related in substance and in part only. The affidavit does not contain every fact known to me through this investigation. The facts relayed are for the purpose of establishing probable cause that Yu Jie **YIN**, and others have participated in a money laundering conspiracy (under 18 U.S.C. § 1956(h)) for the purposes of concealment (i.e. concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)), and a wire fraud conspiracy in violation of 18 U.S.C. § 1349.

2. I am a Special Agent with Internal Revenue Service, Criminal Investigation (IRS-CI), having been duly appointed on July 17, 2022, and, as such, am a Federal Law Enforcement Officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a Government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request the issuance of a federal seizure warrant. Your affiant's responsibilities include the investigation of possible criminal violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), and other financial crimes (Title 18, United States Code, Sections 1956 and 1957), specifically, money laundering violations.

3. I have received extensive training in financial investigative techniques, criminal investigative techniques, criminal law and in the law of search and seizure under the Fourth

Amendment, having undergone 27 weeks of training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.

4. Prior to my employment as a Special Agent with IRS-CI, I was employed as a Revenue Agent with the IRS from November 2020 until July of 2022. As a Revenue Agent, I examined U.S. Individual Income Tax Returns (Form 1040), U.S. Return of Partnership Income (Form 1065), and U.S. Corporation Income Tax Returns (Forms 1120 and 1120S). I hold a Bachelor of Science in Accounting and Business Administration from the University of the Cumberlands in Williamsburg, Kentucky.

5. During my employment with IRS-CI, I have conducted criminal investigations involving tax fraud, money laundering, bankruptcy fraud, wire fraud, identity theft, the illegal structuring of financial transactions, and other financial crimes. Many of these investigations focused on individuals deriving income from both legal and illegal sources. I have participated in the execution of search and seizure warrants, which covered the searches of different locations and the seizing of assets for forfeiture, that constitute the fruits of a crime which were derived with proceeds from criminal means.

## BACKGROUND

6. My involvement with the investigation began in April 2026, based on reports to law enforcement. Initial reporting indicated that Victim 1 located in Louisville, Kentucky, had been a victim of a type of investment scam commonly referred to as a "pig butchering" scheme.

7. Pig Butchering schemes typically begin with a victim meeting someone on an online dating or chat site. Alternatively a victim may receive an unsolicited message or pop-up through a social media application or other means that provide a phone number to call or text. Once contacted by the intended victim, scammers begin a deceitful personal relationship with

victims (either romance or friendship). As the relationship develops, victims are convinced to begin transferring money to an alleged investment opportunity recommended by the scammer. This scheme is usually drawn out over time, with the scammer periodically highlighting substantial “gains” on their investment in order to build false trust and confidence and to encourage victims to invest increasingly larger sums. The “gains” are often presented using a realistic-looking online platform or app, and appear to grow as victims invest more. However, when victims try to withdraw funds, there always seems to be a problem. Scammers will insist the victim pay “fees” or “taxes” to “unlock” the victim’s account. Victims often comply in desperate attempts to gain their money back. When a victim finally realizes they’ve been a victim of fraud, the scammer typically cuts contact.

8. Pig Butchering schemes utilize cash, cryptocurrency, and often gold. Instructing a victim to provide funds in gold serves multiple purposes. Gold is seen by most, including the elderly (the typical targets of this scam), as secure. For older victims, they will be more familiar with gold than a conversion into cryptocurrency. Gold is also, by its nature, very difficult to trace, allowing it to reach areas of international interest without typical traces left behind by standard financial transactions. The difficulty of tracing gold, the fact that it can be moved internationally without requiring currency exchange, and the ability to trade it for currency to reenter the financial system without tying it back to its sources, makes it a useful tool for concealment of criminal proceeds.

CONDUCT IN THE WESTERN DISTRICT OF KENTUCKY

9. In 2025, a Louisville, Kentucky resident was contacted in or around October 2025 (“Victim 1”). Victim 1 was initially contacted by means of pop-up on his computer while

watching a video. The pop-up featured Jensen Huang[1], the CEO of Nvidia, offering a free ChatGPT book. Victim 1 followed the link to receive the free book as advertised which led him to a chat application where he was given excuses for why the book could not be shipped at that time. Victim 1 was then put in contact with an unknown individual ("FNU LNU") on "Line", an application utilized for electronic means of communication. After FNU LNU built trust, Victim 1 was eventually presented with an investment opportunity. Victim 1 was informed that the payment for the investment had to be mostly in gold to keep the amount of currency transactions to a minimum.

10. FNU LNU instructed Victim 1 to purchase gold and provide photos of the gold as proof of the purchase. After the purchase of gold was confirmed, Victim 1 came into contact with a second unknown individual ("FNU LNU 2") to coordinate a time for a courier to pick up the gold and currency from Victim 1. Victim 1 would generally specify the same location each time when meeting couriers, hereinafter referred to as "**meet location**".

11. Victim 1 conducted at least 11 transactions with couriers in Louisville, Kentucky consisting of physical gold and U.S. currency. In return for the gold and currency, Victim 1 would receive a certificate confirming each investment payment, signed by the courier who provided it. Below are the 11 occurrences Victim 1 met with couriers.

a. On November 16, 2025, Victim 1 met the first courier named "Cindy" and provided approximately $16,760 in gold plus $3,600 in U.S. currency.

b. On November 23, 2025, Victim 1 met "Michael" and provided approximately $12,920 in gold and an additional $2,200 in U.S. currency.

[1] This is believed to have been an AI depiction of Jensen Huang used to convince victim 1 of the legitimacy and gain trust with the victim.

c. On December 8, 2025, Victim 1 met "Jack" and provided approximately $17,352 in gold and an additional $23,000 in U.S. currency.

d. On January 3, 2026, Victim 1 met "Amy" and provided approximately $157,405 in gold and an additional $4,000 in U.S. currency.

e. On January 13, 2026, Victim 1 met "Cindy" and provided approximately $22,872 in gold and an additional $9,394 in U.S. currency.

f. On February 3, 2026, Victim 1 "Andy" (Later identified as Yu Jie **YIN** and hereinafter referred to as "**YIN**") and provided approximately $30,176 in gold and an additional $17,000 in U.S. currency.

g. On February 12, 2026, Victim 1 met "Jessica" and provided approximately $174,475 in gold and an additional $6,280 in U.S. currency.

h. On February 27, 2026, Victim 1 met "Alex" and provided approximately $62,775 in gold and an additional $1,230 in U.S. currency.

i. On March 7, 2026, Victim 1 met "Jessica" and provided approximately $155,451 in gold and an additional $1,600 in U.S. currency.

j. On March 14, 2026, Victim 1 met "Andy"(**YIN**) again and provided approximately $138,792 in gold and an additional $5,400 in U.S. currency.

k. On March 22, 2026, Victim 1 met "Andy"(**YIN**) a third time and provided approximately $174,945 in gold and an additional $2,200 in U.S. currency.

12. Victim 1 explained the first eight deposits were to fund their "investment". After the first eight deposits, they wanted to withdraw their money to which they were told they had to pay certain penalties, fees, etc., to withdraw their money from the investment. The final three transactions represent Victim 1's attempts to pay the "fees" and "penalties" necessary to be able

to withdraw their money. Victim 1 has never been able to recoup any funds provided for their investment or fees associated with the need to withdraw their investment.

13. In total, Victim 1 provided a combination of gold and U.S. currency at their cost of approximately $1,039,825. Based on documents provided to IRS-CI by Victim 1, and reviewed by your affiant, they used a multitude of transactions to acquire gold as payment for their "investment" such as: wires from JP Morgan Chase bank, credit card purchases from JP Morgan Chase bank, checks written from PNC bank. Further, in an effort to fund the above listed transactions, Victim 1 depleted their investment accounts and leveraged their personal residence by acquiring a Home Line of Credit ("HELOC").

14. On April 22, 2026, law enforcement was made aware of a twelfth potential meeting with Victim 1 and a courier. Law enforcement observed Co-conspirator 1 meet with Victim 1 and take possession of approximately $38,000 in gold at the **meet location in** Louisville, Kentucky.

15. After the meeting, law enforcement arrested Co-conspirator 1 and searched his person and his backpack located on his person. In Co-conspirator 1's backpack, investigators located multiple certificates similar to those previously received by Victim 1 from other couriers. Investigators conducted a mirandized interview and during the interview, Co-conspirator 1 admitted that the certificates he would provide to victims were fake. Co-conspirator 1 knew they weren't real because he printed them himself prior to coming to the United States.

16. During the interview, investigators located newspaper, aluminum foil and tape in Co-conspirator 1's backpack. Co-conspirator 1 demonstrated the process of wrapping the gold he received from victims in multiple layers of aluminum foil and tape prior to putting the gold into a

FedEx shipping container. Co-conspirator 1 would then be sent a completed shipping label for Co-conspirator 1 to attach to the package of gold.

IDENTIFICATION OF COURIER “ANDY”

17. During the initial interview on April 4, 2026, Victim 1 provided IRS-CI with all certificates previously received from meetings with couriers. Upon review, it was determined that the certificates given to Victim 1 during the three transactions with courier “Andy” were signed at the bottom as “Andy Chen”. Agents collected and stored the certificates as physical evidence in a manner to preserve any potential biological evidence. Agents then submitted the evidence to the IRS-CI Center for Science and Design (forensic lab).

18. On or about August 10, 2026, the IRS-CI lab identified the fingerprints of Yu Jie **YIN (FBI# J3KT8KPAP)** on the payment certificates provided to investigators on April 4, 2026. After the identification of **YIN**, investigators were made aware of his recent arrest in Camden County, North Carolina.

19. The lead detective provided information regarding **YIN**’s case Camden County, North Carolina. The detective informed investigators that Victim 2 had previously met other couriers as part of his scam.

20. Victim 2 was previously contacted in February of 2026 on Facebook by an unknown individual (“FNU LNU 3”). After Victim 2 spoke with FNU LNU for a few months, Victim 2 was introduced to another unknown individual (“FNU LNU 3”) regarding an investment opportunity.

21. In April 2026, Victim 2 made two separate investment deposits totaling $79,410 using cryptocurrency.

22. In May 2026, Victim 2 withdrew $50,000 in U.S. currency from their bank account. An unknown courier arrived at Victim 2's residence and took possession of the $50,000 in U.S. currency.

23. In May 2026, Victim 2 withdrew an additional $30,000 in U.S. currency and provided the currency to a different unknown courier.

24. In June 2026, Victim 2 received an email that his investment account had been frozen and would need to make a "penalty payment" of 10% to unfreeze the account. Victim 2 believed that their investment account had grown to $1,565,736.49 and therefore needed to make a payment of $156,573.65.

25. On June 30, 2026, a courier was scheduled to pick up the "penalty payment" from Victim 2. Law enforcement observed **YIN** pick the package up which he believed contained U.S. currency, but in actuality, law enforcement placed a brick inside of the box **YIN** picked up. **YIN** was arrested by the Camden County Sheriff's office located in Camden, North Carolina for attempting to obtain approximately $160,000 from a victim in Camden County, North Carolina ("Victim 2"). **YIN** was charged with Obtaining Property under False Pretenses.

26. In total, Victim 1 provided a combination of cryptocurrency and U.S. currency of approximately $159,000.

27. On August 11, 2026, investigators made contact with the lead detective at Camden County and determined the following:

a. Subsequent to the arrest, investigators obtained a search warrant for **YIN**'s phone related to his conduct of obtaining funds from victim 2. The search warrant authorized investigators to look for evidence of Obtaining Property under False Pretenses within the phone.

b. Pursuant to that warrant, detectives located in **YIN**'s device pictures of investment certificates similar to those provided to Victim 1.. The certificates pictured were signed "Andy Chen" in handwriting that appears to be the same as the signature of "Andy Chen" on the certificates signed by courier "Andy" and provided to Victim 1.

28. On or about August 11, 2026, your affiant presented photographs of **YIN** to Victim 1. Victim 1 identified **YIN** with 90-95% confidence as the individual known to him as "Andy" that he met and provided gold and U.S. currency on February 3, 2026, March 14, 2026, and March 22, 2026.

29. In summary, investigators located **YIN** conducting activity as a money courier for an investment scam in North Carolina. Investigators have located pictures of contracts similar to that of which Victim 1 received in Louisville, Kentucky on **YIN**'s device with the signature "Andy Chen". The IRS-CI Center for Science and Design located **YIN**'s fingerprints on the certificate Victim 1 received after his payment to **YIN.** Lastly, Victim 1 positively identified **YIN** as the individual who identified themselves as "Andy" to them.

30. I believe that the facts set forth above support that there is probable cause to believe that in or around February and March 2026, in the Western District of Kentucky and elsewhere, Yu Jie **YIN**, committed violations of 18 U.S.C. § 1956(h)(money laundering conspiracy) and 18 U.S.C. § 1349 (wire fraud conspiracy).

WHEREORE, your Affiant respectfully requests that the Court issue a warrant for the arrest of Yu Jie **YIN**.

Respectfully submitted,

*Aaron Kissinger*
Aaron Kissinger
Special Agent
Internal Revenue Service-Criminal Investigations

Subscribed and sworn to by telephone in accordance with Fed. R. Cr. P. 4.1 on August 13, 2026.

UNITED STATES MAGISTRATE JUDGE